Robert W. CHAMBERS, Respondent,

v.

MISSOURI PACIFIC RAILROAD COMPANY, Appellant.

No. 48682.

Supreme Court of Missouri,

Division No. 2.

April 9, 1962.

George W. Holmes, Mark M. Hennelly, Allen D. Churchill, St. Louis, for appellant.

Edward W. Fredrickson, St. Louis, for respondent; William L. Mason, Jr., St. Louis, of counsel.

BARRETT, Commissioner.

Robert W. Chambers was a heavy equipment operator employed by the Missouri Pacific Railroad Company. Beginning in January 1959, his job was to operate a "dozer and buggy," earth moving machinery consisting of a bulldozer attached to a large scoop or "bucket." He claims that he was not familiar with the clutches or other mechanism by which the buggy was controlled and that, except to grease, casually inspect and operate, he had not been instructed in the repair of the machinery. In this action under the Federal Employers' Liability Act (45 U.S.C.A. § 51), Chambers claims that his employer furnished him an unsafe tool and machine with which to work and that on April 15, 1959, he was injured as he attempted to dump and spread a load of dirt from the buggy. In his petition the charge of unsafe machine was that "when plaintiff moved and actuated a lever on said dozer which controlled the operation of the cables on said buggy in the usual and ordinary manner, *the said lever did not move and function in the usual and ordinary manner, but instead moved suddenly and violently in a sudden, unanticipated, unusual and violent manner."* In so far as material here the hypothesis of his instruction 5 was that certain operations of the machine were controlled by a lever which normally operated without any unusual movement, but on this particular occasion "the plaintiff pushed said lever in the said usual and customary manner; and that the *said lever then and there moved suddenly, violently, and in an unusual manner;* and that such movement directly caused injury to plaintiff; then you are instructed that *such facts,* if you believe them to be true, *are sufficient evidence to warrant a finding by you that the said machine was not reasonably safe* and that defendant failed to exercise ordinary care *and was thereby negligent* in providing it for plaintiff to work with, and you may so find, unless you find and believe from other facts and circumstances in evidence that the defendant was not negligent; * * *."

In support of his claim Chambers testified that *between 2 and 2:30 o'clock* on the afternoon of *April 15, 1959,* he reached back with his right hand to "get this left lever and bring it over to your right" to dump and spread the load of dirt. It was while engaged in this operation, "While dumping this dirt out, that's whenever I got the jerk." He said, "I had my hand back on the lever pulling the dirt forward and *something gave me that jerk to my shoulder and jerked me back."* He described the jerk as "hard," pulling his shoulder and neck, and "I automatically turned everything loose * * * knocked loose from this lever here." Chambers said that two weeks previously he had experienced some difficulty with the levers, the trouble was "operating awfully hard." He told fellow employees about the difficulty, particularly Mr. Johnson, the motorcar repairman. Mr. Johnson said something about the clutches being in bad shape "and he told me I hadn't been running the damn thing enough to get the rust off of the clutches." He was alone, three or four

hundred yards from the dragline, when he experienced this mishap and "was knocked loose" from the lever. He did not know what caused the lever to jerk. And, he said, "I didn't realize I was hurt at that time," he "stretched around" while sitting on the dozer and hauled three or four more loads of dirt "before quitting time because we have to quit early in order to get in in time or schedule."

■ In these circumstances the railroad urges that the court erred in overruling its motions for a directed verdict for the reason that Chambers "failed to make a submissible res ipsa loquitur case" in that he (1) demonstrated or could have demonstrated by his evidence the cause of his alleged injury, (2) failed to produce evidence easily within his reach, and (3) demonstrated by his evidence that the offending instrumentality was under his control and within his superior knowledge. In substantiation of its position the railroad reviews several cases dealing with res ipsa loquitur as the doctrine has been expounded and applied to particular circumstances by this court, for example the leading cases of McCloskey v. Koplar, 329 Mo. 527, 46 S.W.2d 557, 92 A.L.R. 641, and Gordon v. Muehling Packing Company, 328 Mo. 123, 40 S.W.2d 693. But it is not necessary in this opinion to attempt a further exposition of the doctrine, to consider its rationale, or even to indicate what this court thinks the constituent elements of the doctrine may be. "The views of the Federal courts, not the state courts, constitute the supreme law on questions arising under the Federal Employers' Liability Act." Allen v. St. Louis-San Francisco Railroad, (Mo.) 297 S.W.2d 483, 488, a case relied on by the appellant. And, it has become established almost beyond question that in appropriate circumstances the doctrine of res ipsa loquitur is applicable in cases under the act. Jesionowski v. Boston & Maine R. Co., 329 U.S. 452, 67 S.Ct. 401, 91 L.Ed. 416; Warner v. Terminal Railroad Ass'n of St. Louis, 363 Mo. 1082, 1091, 257 S.W.2d 75, 79. When the doctrine is applicable, a verdict

may be directed for a defendant in a case arising under the act, "However, such judicial action is justified only in the rare case where the circumstances are such that no jury would be justified in rejecting the evidence of the defendant which, if true, would be sufficient to rebut the inference created by the application of the res ipsa loquitur doctrine." Annotation (Res ipsa loquitur in Federal Employers' Liability Act cases) 35 A.L.R.2d 475, 562; Terminal R. Ass'n of St. Louis v. Staengel, 8 Cir., 122 F.2d 271.

■ If there was an "extraordinary happening" it is immaterial that there was divided control of the offending instrumentality (Jesionowski v. Boston & Maine R. Co., supra), and "proof that plaintiff was operating or was working with the instrumentality (a motorcar) involved in the accident did not bar the right of plaintiff to proceed under the res ipsa loquitur doctrine when there was evidence that his operation did not cause the accident and there was evidence from which the jury could infer negligence, which was the proximate cause of the accident, in the operation, maintenance or repair of an instrumentality when that operation, maintenance or repair was under the exclusive control of the defendant." Allen v. St. Louis-San Francisco Railroad, 297 S.W.2d, 1. c. 488; Cantley v. Missouri-Kansas-Texas R. Co., 353 Mo. 605, 183 S.W.2d 123. The sudden stop or jerk of a train, in the absence of positive evidence of specific conduct or defect, is an unusual occurrence or an "extraordinary happening." Annotation 60 A.L.R.2d 637; Heppner v. Atchison, T. & S. F. Ry. Co., (Mo.) 297 S.W.2d 497. Chambers was there, he had experienced some previous difficulty with the lever, but the railroad does not indicate just what evidence he failed to produce or how he did or could "have demonstrated * * * the cause of his alleged injury." In Wiles v. New York, Chicago & St. L. R. Co., 3 Cir., 283 F.2d 328, the stem or ratchet on a large jack gave way and it was held that the plaintiff was "entitled to the inference

of negligence afforded by the res ipsa loquitur doctrine since the jack and its internal mechanism were under the Railroad's exclusive control and the accident was not one which would ordinarily occur in the absence of negligence." If the circumstances in that case justified the jury's conclusion "that employer negligence played a part in producing the petitioner's injury" (Moore v. Terminal Railroad Ass'n of St. Louis, 358 U.S. 31, 79 S.Ct. 2, 3 L.Ed. 2d 24), by the same token the circumstances as testified to by Chambers support the inference and conclusion.

The railroad, of course, denied that it was negligent in any manner, but its principal defense was that Chambers was not at work between the hours of 2 and 2:30 on the afternoon of April 15, 1959, or, if he was, that his present disability was due to an accident and injury in 1954. He did not immediately report the occurrence of April 15, in fact the next day, when he went with his friends, the Halls, to a doctor in Falls City, Nebraska, he told the doctor that his back trouble was caused by his backing a bulldozer into a cement embankment in 1954. He told several friends and acquaintances that his present physical disabilities were due to the 1954 accident. It was not until his last discharge from the Missouri Pacific Hospital in St. Louis in August 1959 that he told a claim agent that he had been involved in an accident on April 15, 1959. The railroad's witnesses, three of the plaintiff's friends and fellow employees, testified that on April 15, 1959, the dragline boom had broken down and they repaired it in the morning and did not work in the afternoon. They said, after stopping at the home of Chambers' grandmother and planting some potatoes for her, that they returned to their bunk cars at Hiawatha where from two to four o'clock Chambers and Mrs. Hall watched television, particularly "The Verdict Is Yours" which started at 2 o'clock.

Because of this and other similar evidence the railroad, with considerable force, argues that the jury's verdict "was so manifestly unsupported by the believable evidence and so palpably against overwhelming evidence to the contrary that to allow the verdict to stand would be a travesty on justice." Nevertheless, Chambers testified positively that he was injured between the hours of 2 and 2:30 on the afternoon of April 15, 1959, and that his present injury was due to the accident on that day and not to an injury sustained in 1954. And, there are some circumstances that weaken the railroad's position. To prove that Chambers did not work in the afternoon the railroad relies wholly on the memory and oral testimony of the Halls and Stensrud, no work records were offered in evidence. Then too, the plaintiff's neurosurgeon testified that Chambers' present injury is a "herniated cervical disc at the level of C–5 —C–6 on the right." It was the opinion of the surgeon that Chambers could not have worked as a heavy equipment operator from 1954 to 1959 if he had sustained such an injury in 1954.

 In any event, this is but to illustrate the railroad's claim and defense, in support of which, incidentally, it does not even purport to cite an authority. The admitted fact that Chambers did not timely and properly report the accident of April 15, 1959, does not create an estoppel or conclusively bar his recovery in this action. Wiles v. New York, Chicago & St. Louis R. Co., 3 Cir., 283 F.2d, 1. c. 331. So also his prior inconsistent claims and statements do not as a matter of law defeat the action. "True, his testimony was contradictory of former statements, but his credibility would be a matter for a jury." Schnee v. Southern Pac. Co., 9 Cir., 186 F.2d 745, 746. There was evidence in favor of and against the existence of these factual issues and this court may not award a new trial on the ground that the verdict is against the weight of the evidence; "the Circuit Court is the proper tribunal to determine whether the verdict of the jury should stand or not." Nearns v. Harbert, 25 Mo. 352, 355; Wilcox v. Coons, 362 Mo. 381, 397, 241 S.W.2d 907, 917.

■ It is in connection with these disputed issues that the railroad contends that the court erred in giving instruction 5, as previously indicated the principal instruction, and instruction 7 on the measure of damages. Following an introductory paragraph and preceding the hypothesis of negligence instruction 5 says, "Therefore, if you find and believe from the evidence that *on or about the 15th day of April, 1959,* at or near Willis, Kansas * * *." Instruction 7, in its introductory paragraph and before listing the items for which damages could be awarded, told the jury, if they found for the plaintiff, that he was to be compensated for injuries and damages "sustained by him on the occasion in question." It is now urged that the quoted language was broader than the pleadings, "not within the scope of the evidence, failed to require the jury's determination of the disputed factual controversies, and gave the jury a roving commission." It is not necessary to further detail the railroad's argument, specifically its objection is that the jury was not limited to a finding that the accident occurred *on April 15, 1959,* but was permitted to find that it happened *"on or about April 15, 1959."*

There are of course circumstances in which the precise time and date of an occurrence and its specific hypothesis is the essence of a case (Crawford v. Arends, 351 Mo. 1100, 176 S.W.2d 1; State v. Armstead, (Mo.) 283 S.W.2d 577), but the problem here is whether these instructions were manifestly prejudicial and require the granting of a new trial by this court. It is in part for this reason that the evidence concerning the weight of the evidence has been set forth. Chambers did not claim and there was no evidence to support a claim that he was injured "on or about" some date, he testified that he was injured between the hours of 2 to 2:30 on April 15, 1959. The jury could not possibly have found or understood that he was injured "on or about" some other time or date or that they could have awarded him damages for injuries sustained on some other occa-

sion. In addition to its evidence on these issues (to say nothing of the arguments to the jury), the railroad offered and the court gave an instruction which told the jury that if they found "that on April 15, 1959, at the time mentioned in evidence that plaintiff was not operating a bulldozer and buggy at Willis, Kansas," but was in a bunk car in Hiawatha watching television, he could not recover. Then there was another instruction: "The Court instructs the jury that in this case *the plaintiff is seeking to recover for injuries alleged to have been sustained on April 15, 1959,* and in no event are you to award him any damages for any condition of injury or ill health, if any, which he may have had or may have sustained before said date of April 15, 1959." In these circumstances the words "on or about" did not "put the time at large" or unfairly submit an issue about which there could have been the slightest question. Summers v. Tavern Rock Sand Company, (Mo.) 315 S.W.2d 201.

■ And finally, the railroad urges that "Under the peculiar circumstances of this case, where appellee had sustained numerous prior injuries, the verdict was grossly excessive." Respondent's counsel, attacking this assignment in several particulars, has refused to brief the point, and the consequence is that the court is left to its own devices. In the only case cited by the respondent, Knight v. Swift & Company, (Mo.) 338 S.W.2d 795, the assignment was "(t)he verdict is so excessive as to require a new trial" and the court limited its review to that specific problem, whether "the verdict is so excessive as to require a new trial." While the assignment here is lacking in specificity, it has been held that "the verdict was excessive" and that "the verdict was grossly excessive" assigned errors "arising out of the amount of the verdict and the conditional remittitur order." Osburn v. Kansas City Southern Ry. Co., 360 Mo. 813, 815, 230 S.W.2d 856, 858. On the other hand, the cases relied on by the appellant are helpful only in so far as they state the general rules applicable to remit-

titur procedure in this jurisdiction, for example, Breland v. Gulf, Mobile & Ohio R. Co., (Mo.) 325 S.W.2d 9. Since 1950 there have been at least six cases in this court dealing with various types of disc injuries and the problem here is whether, the trial court having required a remittitur of $5,000 from a $43,000 verdict, the judgment of $38,000 is excessive and requires a further remittitur. Hayes v. Wabash Railroad Co., 360 Mo. 1223, 233 S.W.2d 12.

When Chambers was in the Falls City Hospital Dr. Wilkinson's diagnosis was a "possibility of a cervical disc injury" and he recommended that Chambers go to the Missouri Pacific Hospital in St. Louis "for further evaluation." On his first admission to Missouri Pacific Hospital the final diagnosis was "Old sprain, right shoulder and neck." On his readmission, July 13, 1959, the diagnosis was "Old cervical and lumbar sprain, cervical spondylitis," and on August 1 the diagnosis was "old sprain in cervical and lumbar regions." He was discharged from the Missouri Pacific Hospital on August 20, 1959, presumably to return to work. It was on that date that he reported the accident to the claim agent and went to Dr. Jacques P. Schaerer, a neurosurgeon in St. Louis. Dr. Schaerer performed a myelogram and, as indicated, his diagnosis was "a herniated cervical disc at the level of C–5—C–6 on the right." He could not say from the film that it was "a complete rupture" or whether it "just bulged, * * * it's either one of those two." There were no ill effects from the myelogram, but it was the doctor's opinion that Chambers' injury was painful, that it was permanent, that he could not continue as a heavy equipment operator and "the only measure from which he can expect relief would be surgical treatment," the removal of the "protruding portion of the disc and take the pressure off of the nerve root." The doctor said that surgical results could not be guaranteed but "good results" were had in 80% of the cases and in about 20% of the cases there was no improvement. Chambers has not had surgery. The railroad offered no medical evidence other than the deposition of Dr. Wilkinson and its hospital records and so, in effect, Chambers' medical evidence stands unchallenged as to the nature and extent of his injuries. As a heavy equipment operator he was paid about $450 a month, he was 42 when the case was tried and has a life expectancy of 31.29 years.

In Kelly v. Kansas City Public Service Co., (Mo.) 335 S.W.2d 159, the plaintiff was 43, there was an established monetary loss of $12,592.92, and a laminectomy to remove a disc, and it was held that a verdict of $36,000 was not excessive. In Van Norman v. Illinois Central R. Co., (Mo.) 320 S.W.2d 512, a man 28 earning about $300 a month had three ruptured discs and an operation and this court reduced a $62,400 verdict $15,000. In Pinter v. Gulf, Mobile & Ohio R. Co., 362 Mo. 887, 245 S.W.2d 88, there was an unsuccessful disc operation, the trial court reduced a $45,000 verdict $5,000 and this court refused to enforce a further remittitur. In Greco v. Hendricks, (Mo.) 327 S.W.2d 241, there was at most a diagnosed disc injury, the plaintiff refused to remit $12,000 from a $32,000 verdict and the trial court granted a new trial. The plaintiff appealed but upon that record it was held that the trial court did not abuse its discretion in granting a new trial on the ground that the $32,000 verdict was excessive. In Hayes v. Wabash R. Co., supra, the first disc case, there was a diagnosed herniated nucleus pulposis and additional injury from a myelogram. The trial court required a remittitur of $5,000 from a $45,000 verdict and this court reduced the judgment to $37,500. In Rogers v. Thompson, (Mo.) 308 S.W.2d 688, the plaintiff was 24 and there was a diagnosis of a ruptured and prolapsed intervertebral disc between the first lumbar and the first sacral vertebrae, and this court declined to require a remittitur from a $40,000 verdict. Whatever one may think of the size of these verdicts and regardless of what the truth may be as to the seriousness and disabling effect of the injury involved in this case, it

is not possible in view of these precedents to substantially reduce this judgment of $38,000.

Since, for the reasons indicated, the appellant is not entitled to any of the relief requested, the judgment is affirmed.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All of the Judges concur.